IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CALEB J. RECK, | ) | CASE NO. 5:17-cv-00991 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Caleb J. Reck ("Plaintiff" or "Reck") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for social security disability benefits. Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 13. As explained more fully below, the Court **AFFIRMS** the Commissioner's decision.

## I. Procedural History

Reck protectively filed an application for Disability Insurance Benefits ("DIB") on March 26, 2015.[1] Tr. 13, 63, 73, 180-186. Reck alleged a disability onset date of November 11, 2014. Tr. 13, 31-32, 63, 180, 228. He alleged disability due to PTSD, spondylosis, and radiculopathies. Tr. 63, 89, 101, 231. Reck's applications were denied initially (Tr. 89-91) and

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application." http://www.socialsecurity.gov/agency/glossary/ (last visited 5/1/2018).

upon reconsideration by the state agency (Tr. 101-107). Thereafter, he requested an administrative hearing. Tr. 108-109.

On December 14, 2016, Administrative Law Judge Jeffrey Raeber ("ALJ") conducted an administrative hearing. Tr. 29-62. In his January 9, 2017, decision (Tr. 10-28), the ALJ determined that Reck had not been under a disability within the meaning of the Social Security Act from November 11, 2014, through the date of the decision (Tr. 13, 23). Reck requested review of the ALJ's decision by the Appeals Council. Tr. 8-9. On March 3, 2017, the Appeals Council denied Reck's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-5.

## II. Evidence

### A.     Personal, vocational and educational evidence

Reck was born in 1990. Tr. 22, 180. At the time of the hearing, Reck had been married just over a year and he resided with his wife and three-year old son. Tr. 37-38. Reck completed high school. Tr. 40.

Reck's last job was working as a supervisor at TK Gas where they "flowed wells, condensation, and gas to the surface to the pipeline." Tr. 34. As a supervisor, Reck managed three to four workers at a time. Tr. 34. Reck was involved in supervising and he was involved in the well work too. Tr. 34. Reck worked at TK Gas for about six months. Tr. 34. He left the TK Gas job after seeing a co-worker "burn to death[]" in an accident at work. Tr. 34-35. Before working at TK Gas, Reck worked for about four months at JW Energy doing wire line work. Tr. 35. Reck also worked for about nine or ten months for Integrated Production Services doing coil tubing work. Tr. 35. Prior to working the foregoing jobs, Reck was in the Marine Corps from January 25, 2009, through October 26, 2012. Tr. 36. While in the Marine Corps, Reck's jobs

included motor transport vehicle operator, logistics vehicle system operator, and machine gunner. Tr. 36. Reck left the Marine Corps through "the early out program." Tr. 36. He had a job waiting with Integrated Production Services and was no longer able to deploy so he felt his service was no longer needed. Tr. 36-37.

## B.    Medical evidence

### 1.    Treatment history

In December 2014, Reck was screened and evaluated at the Veterans Administration Hospital ("VA") for traumatic brain injury ("TBI"). Tr. 436-444, 444-445. Reck reported experiencing two blasts or explosions in June 2011 while deployed. Tr. 437, 444-445. During both explosions, Reck was hit by debris, shrapnel or other items and, during one explosion, Reck was thrown to the ground or against a stationary object. Tr. 437. Immediately following the explosion, Reck was dazed, confused or "seeing stars." Tr. 445. Since the explosion, Reck reported that the following problems started or had gotten worse: memory problems or lapses, balance problems or dizziness, sensitivity to bright light, irritability, headaches, and problems with sleep. Tr. 445. Reck's TBI screening was positive and he was referred for a further evaluation. Tr. 445.

Reck's further evaluation at the VA's TBI clinic was on December 10, 2014, by Elizabeth Treiber, a nurse practitioner. Tr. 436-444. Reck explained his memory was "not too bad" – he forgot little things but nothing severe. Tr. 440. He was having four to six headaches each day, lasting from one minute to two hours. Tr. 440. Reck was not taking any pain medications at the time and he was not taking medication prescribed by his primary care physician for headaches because he was concerned about side effects. Tr. 440. Reck reported problems sleeping and feeling irritable all the time. Tr. 440-441. He had started Celexa the

week prior and was starting to feel better. Tr. 441. Reck denied suicidal and homicidal ideation. Tr. 441. He reported pain in his neck, lower back, shoulders, knees and ankles. Tr. 441. On physical examination, Reck's range of motion in his extremities was within normal limits and his strength was normal. Tr. 441. Reck's gait was normal. Tr. 442. He showed difficulty with tandem Romberg testing. Tr. 442. He exhibited decreased sensation to light touch on the left side of his face and scalp. Tr. 442. Reck was engaged to the mother of his 18 month-old son. Tr. 441. He had stopped working in November 2014 to address his worsening irritability. Tr. 441. Reck indicated he eventually wanted to return to his job. Tr. 441. He was taking groups of people goose hunting. Tr. 441. Nurse Treiber prescribed a different medication for Reck's headaches. Tr. 443. Nurse Treiber referred Reck to Dr. Mark Walker for a neurological consult and to Dr. Suzanne Ruff for discussion of non-medication management of Reck's headaches and sleep hygiene. Tr. 439, 443. She also encouraged Reck to continue with mental health treatment at the VA. Tr. 443.

On December 29, 2014, Reck saw Dr. Ruff in Polytrauma Behavioral Medicine regarding his chronic headaches and problems sleeping. Tr. 366-367. Reck was having daily headaches that were short in duration but intense. Tr. 367. He was also having left-sided migrainous headaches with photo-phobia but no nausea. Tr. 367. Reck indicated that his back pain greatly disrupted his sleep. Tr. 367. Reck was agreeable to a mental health consultation. Tr. 367.

On January 7, 2015, Reck saw Dr. Walker for a neurological consult regarding his imbalance issues. Tr. 369-373. Dr. Walker observed that Reck's examination showed a mild imbalance that was worse with eyes closed. Tr. 373. Dr. Walker indicated that, otherwise, there were "no specific signs to localize this to the peripheral or central vestibular system[]" and a December 16, 2014, brain MRI was normal. Tr. 331, 373. But Dr. Walker noted that it was

possible that Reck had a mild vestibular injury (peripheral or central) that was not evident on examination. Tr. 373. Thus, Dr. Walker referred Reck to vestibular therapy for additional evaluation and treatment. Tr. 373.

Reck missed a physical therapy vestibular balance appointment in February 2015 and a new consult was not scheduled. Tr. 355-356. It was noted that, if a new consult was submitted, Reck's primary care physician would need to document in Reck's file the importance of the appointment and Reck's willingness to keep the appointment. Tr. 356.

On January 26, 2015, Reck saw Dr. Kalyani Shah regarding his low back pain, neck pain, and bilateral knee pain. Tr. 357-362. Reck reported that his low back pain radiated to his legs bilaterally. Tr. 358. He described his low back pain as sharp and the pain was aggravated by bending, leaning forward, walking and taking the stairs. Tr. 358. The pain was alleviated by sitting, lying down, resting, taking medication, changing positions, and using heat and ice. Tr. 358. Reck reported numbness in his bilateral extremities. Tr. 358. Reck's neck pain radiated to his arms and was aggravated by looking up and by rotation. Tr. 358. His knee pain was sharp and was aggravated by walking. Tr. 358. On examination, Reck was in no acute distress. Tr. 359. His mood was normal and his affect was appropriate. Tr. 359. His gait was non-antalgic. Tr. 360. He was able to walk on his heels and toes without difficulty for a few steps. Tr. 360. Reck had painful range of motion in his cervical spine with flexion and painful range of motion in his lumbar spine with flexion and extension. Tr. 360. Straight leg raise was negative in Reck's bilateral lower extremities. Tr. 360. He exhibited muscle tenderness in his cervical paraspinals and lower lumbar paraspinals bilaterally. Tr. 360. Reck's sensation was intact to light touch. Tr. 360. His motor strength was normal in his bilateral upper and lower extremities. Tr. 360. Imaging studies of the cervical spine from December 2014 showed mild disc space

narrowing and straightening of the cervical lordosis. Tr. 329, 360. Imaging studies of the lumbar spine from December 2014 showed disc space narrowing at the L5-S1 level with anterolisthesis and probable bilateral spondylosis. Tr. 328, 360-361. Dr. Shah prescribed medication and referred Reck for physical therapy for his cervical and lumbar spine. Tr. 361.

On March 11, 2015, Reck saw Nathan Stephens, a clinical psychologist, for an initial psychological assessment. Tr. 407-410. Reck was referred to Dr. Stephens for evaluation of his PTSD symptoms. Tr. 407. Reck reported various symptoms, including nightmares, anxiety, anger, having a short-fuse, depression, desire to avoid crowds, and having an unstable mood. Tr. 407-408. Reck relayed that his fiancée and father had encouraged him to seek mental health treatment from his primary care physician because they were concerned about his mood and behavioral "red flags." Tr. 410. Reck indicated that he used to enjoy going out and socializing but now hates doing so. Tr. 408. Reck reported that stressors included not working. Tr. 408. Reck indicated he had not worked since November 2014 because of medical concerns and difficulty getting along with others at work. Tr. 408. On examination, Dr. Stephens observed Reck to be alert and oriented, psychomotor activity was within normal limits, his speech was normal, his cognition was grossly intact, his thought process was coherent and goal directed, he had no delusions or hallucinations, he denied suicidal or homicidal ideation, his mood was severely depressed and his affect was blunted, and he had good judgment and insight. Tr. 408. Dr. Stephens assessed unspecified anxiety disorder, unspecified depressive disorder, and rule out PTSD. Tr. 410. Due to time limitations, Dr. Stephens was unable to complete the assessment and indicated that further evaluation of Reck's PTSD symptoms would occur during the next session. Tr. 410.

On March 11, 2015, Reck also saw and Jennifer Spies, a nurse practitioner, in the psychiatry department for medication management. Tr. 403-407. Nurse Spies reviewed Reck's current medications and Reck indicated he felt that his medications were starting to work. Tr. 404. He was still having problems with anger, irritability, sleep and depression. Tr. 404. On examination, Nurse Spies observed that Reck's speech was clear, his thought process was future oriented, he had no suicidal or homicidal ideations, his mood was "okay," his affect was flat, his insight/ judgment were fair, his sensorium/cognition were good, he had mild issues with short term memory, and his attention span was fair. Tr. 405. Also, it was noted that Reck's appetite was good and his energy was up and down and, his impulse control was noted as "anger and irritability." Tr. 405. Nurse Spies continued Reck on citalopram and restarted him on prazosin. Tr. 406.

X-rays of Reck's knees were taken on March 16, 2015. Tr. 326-327. They showed no significant abnormality of the bones, joints or adjacent soft tissue. Tr. 326-327.

Reck presented for an initial physical therapy session on April 3, 2015, with Jared Roberts. Tr. 340-342, 398-400. Reck's main complaint was low back pain. Tr. 340. He reported radicular shooting, tingling symptoms bilaterally down his legs into his feet. Tr. 340. Reck indicated that his low back pain symptoms had increased over the prior few months. Tr. 340. His symptoms were exacerbated by bending forward, sitting for using the restroom, long periods of standing, and doing the dishes. Tr. 340. Reck reported getting little pain relief from over-the-counter NSAIDs. Tr. 340. Reck was not involved in a regular exercise routine. Tr. 340. Mr. Roberts indicated that Reck's subjective complaints and objective examination findings were most consistent with discogenic low back pain. Tr. 341. Mr. Roberts noted decreased lumbar range of motion in extension, decreased hip strength, decreased hip flexibility,

and decreased core stabilization. Tr. 341. Mr. Roberts recommended that Reck attend one therapy session per week for four weeks. Tr. 341. Reck missed physical therapy appointments on April 22, 2015, and April 29, 2015. Tr. 388, 607. Due to Reck's failure to attend his physical therapy appointments, Reck's future appointments were cancelled by the physical therapy department. Tr. 607.

Reck saw Dr. Stephens and Nurse Spies again on April 10, 2015. Tr. 388-390, 393-397. Dr. Stephens noted that Reck presented himself in a neutral mood with a somewhat brighter affect. Tr. 388. Reck was cooperative and pleasant and open and forthcoming during his session with Dr. Stephens. Tr. 388. Nurse Spies observed that Reck's speech was clear; his thought process was future oriented; his mood was "okay;" his affect was flat; his insight/judgment were fair; his sensorium/cognition were good; and he had mild issues with short term memory. Tr. 395. Reck reported to Dr. Stephens and Nurse Spies that he had considered suicide two weeks earlier while visiting his father in Illinois. Tr. 389, 394. He found a loaded gun at his father's house and considered using it. Tr. 389. He woke his father up and talked with him throughout the night. Tr. 389. Reck indicated that the incident scared him. Tr. 389. He reported that he was not currently having suicidal ideations. Tr. 389, 394. Reck reported a remote legal problem from having been in a fight at a country concert. Tr. 389, 390. He was not charged in connection with the incident. Tr. 390. Reck relayed to Nurse Spies that he felt that his medications were working to improve his mood, decrease his depression, decrease his irritability and helping with his nightmares and dizziness. Tr. 394. He was still having problems sleeping, ongoing low back pain, and ongoing issues with headaches. Tr. 394. Reck was not taking topiramate for his headaches. Tr. 394. Since having stopped taking the topiramate in February, Reck's headaches had gotten worse. Tr. 391. Nurse Spies placed a call to Nurse Treiber while

Reck was with her.  Tr. 391.  Reck explained he had given topiramate a "good try" but was not interested in restarting that medication.  Tr. 391.  He was interested in trying a different medication.  Tr. 391.   Nurse Treiber started Reck on amitriptyline and continued him on prazosin for restless sleep, nightmares, and headache prevention.  Tr. 392.  An EKG was ordered.  Tr. 392, 396.  Reck's leisure activities included waterfowl hunting and spending time with his family.  Tr. 390.  Dr. Stephens recommended that Reck begin therapy.  Tr. 390.  Reck agreed to start therapy in three to four weeks and contact the mental health clinic sooner if needed.  Tr. 390.

On May 19, 2015, Reck saw Nurse Treiber in the TBI clinic for follow up concerning his headaches.  Tr. 470-473.  Reck relayed that things were going "okay."  Tr. 470.  He had recently returned from a vacation that he took with his fiancée, son, and service dog to Tennessee.  Tr. 470.  They were visiting with his fiancée's family.  Tr. 470.  They all enjoyed themselves and were able to relax.  Tr. 470.  Reck was not working.  Tr. 470.  He indicated he was trying to get his "VA stuff" taken care of and had a lot of summer projects around the house.  Tr. 470.  He was considering volunteer opportunities and he tried to work out every day.  Tr. 470.  Reck had been a no show for physical therapy.  Tr. 470.  He felt he did not need physical therapy; he was doing his home exercises on daily basis and felt that the physical therapy gym in Akron was too small and claustrophobic.  Tr. 470.  Reck was willing to consider vestibular rehabilitation but preferred to be seen at the Wade Park location. Tr. 473.  Reck denied any current suicidal or homicidal ideations.  Tr. 470.  Reck was still having some difficulty falling asleep but he was sleeping better through the night.  Tr. 470.  He was still having painful headaches but the number of headaches had decreased.  Tr. 470.  Reck felt that amitriptyline was helping a little with his headaches and staying busy and getting outside was helping.  Tr. 470.  On physical examination,

Reck was in no acute distress; his range of motion and strength in his extremities was normal; his gait was normal; he had diminished facial sensation to light touch on the left side of his face; he swayed with Romberg testing and exhibited loss of balance with tandem Romberg testing but he could tandem walk, tiptoe, and heel walk without difficulty; his attention was normal. Tr. 472. Nurse Treiber increased the dosage of Reck's amitriptyline and continued his prazosin. Tr. 473. She stressed the importance of ongoing mental health treatment and introduced him to Adam Wendt in the vestibular rehabilitation department. Tr. 473. Reck also saw Dr. Ruff on May 19, 2015. Tr. 602-603. Dr. Ruff referred to Nurse Treiber's notes when indicating that Reck had made some progress with his headaches. Tr. 602.

On June 9, 2015, Reck saw Mr. Wendt for a physical therapy evaluation concerning Reck's complaints of dizziness, imbalance and some difficulty walking. Tr. 464-469, 597-602. Based on his testing observations, Mr. Wendt noted that there was some question as to whether Reck was giving his maximum effort during testing. Tr. 597. Reck reported getting dizzy when getting out of bed and driving. Tr. 465. He was having episodes daily that lasted about 30 seconds to a couple of minutes. Tr. 465. He also reported falling about once each month, dropping things at times, and having a decreased grip. Tr. 465. Reck did not use a cane for ambulation. Tr. 465. Reck was independent in his activities of daily living. Tr. 465. Mr. Wendt recommended therapy once each week for a total of six to eight sessions. Tr. 469. Reck attended one additional therapy session with Mr. Wendt, which was on June 15, 2015. Tr. 463-464. During that session Mr. Wendt again indicated that there was some question as to whether Reck was giving his maximum effort, noting that Reck was able to show significant improvement with balance with just some simple education and instruction. Tr. 464. Reck cancelled a therapy appointment with Mr. Wendt on June 30, 2015, and did not call to reschedule

the appointment. Tr. 463. As a result, on July 20, 2015, Mr. Wendt discharged Reck from physical therapy. Tr. 463.

Reck saw Dr. Frank Lingel at the VA on August 4, 2016, for a primary care follow up. Tr. 590-592. It was noted that Reck had not been seen since January 2015. Tr. 591. Reck had intentionally lost weight; he was exercising regularly. Tr. 591. Reck's anxiety had improved with Celexa. Tr. 591. Reck's headaches were unchanged. Tr. 591. He complained of low back pain and he was having orthostatic symptoms daily. Tr. 591. Dr. Lingel observed that Reck ambulated without difficulty. Tr. 591. Dr. Lingel assessed orthostatic hypotension, low basal bp; intentional weight loss; and history of cervicalgia and low back pain. Tr. 592. Dr. Lingel ordered labs, started Reck on a trial of fludrocortisone and advised Reck to follow up in three to four weeks. Tr. 592.

A September 23, 2016, x-ray of Reck's hips showed mild narrowing of the left hip joint. Tr. 483. The right hip joint was preserved. Tr. 483. Reck did not follow up with Dr. Lingel following the August 4, 2016, visit because he was traveling. Tr. 568. He saw Dr. Lingel again on October 4, 2016, for follow up regarding abdominal pain and groin pain. Tr. 568. Reck reported continued lightheadedness. Tr. 568. Reck did not feel that the fludrocortisone that Dr. Lingel had prescribed for his orthostatic hypotension had been effective. Tr. 568. Dr. Lingel noted that Reck ambulated without difficulty. Tr. 568. An echocardiogram was performed on October 14, 2016, for evaluation of Reck's orthostatic hypotension. Tr. 505-507, 569. The echocardiogram showed the left ventricular systolic function was low normal; the ejection fraction estimate was 50-55%; and the right ventricle was mildly dilated. Tr. 507. It was recommended that a "Definity study" be considered for better evaluation of the left ventricle function. Tr. 507.

### 2. Opinion evidence

#### a. VA benefit determination

On April 10, 2015, the VA awarded benefits to Reck based on a finding that Reck's PTSD with major depressive disorder and residuals of traumatic brain injury was 100 percent disabling.  Tr. 201-220, 310-320.

In its rating decision, the VA explained that an evaluation of 100 percent is warranted under the mental disorders criteria based on:

- Total occupation and social impairment
- Difficulty in adapting to a worklike setting
- Difficulty in adapting to stressful circumstances
- Near-continuous depression affecting the ability to function independently, appropriately and effectively
- Difficulty in establishing and maintaining effective work and social relationships
- Disturbances of motivation and mood
- Flattened affect
- Anxiety
- Chronic sleep impairment
- Depressed mood

Tr. 315.  The VA proceeded to explain that Reck's "overall evidentiary record shows that the severity of [his] disability most closely approximates the criteria for a 100 percent disability evaluation." Tr. 315.  Further, the VA explained that there was a likelihood of improvement with respect to the evaluation of PTSD with major depressive disorder and residuals of traumatic brain injury, the assigned evaluation was not considered permanent and was subject to a future review examination.  Tr. 316.

The VA also found that each of the following conditions was 10 percent disabling: lumbar strain with degenerative disc disease L5-S1; lumbar radiculopathy, left lower extremity associated with lumbar strain and degenerative disc disease L5-S1; and lumbar radiculopathy,

right lower extremity associated with lumbar strain with degenerative disc disease L5-S1.  Tr. 202.

### b. Consultative examiner

On April 26, 2016, Reck saw psychologist Robert F. Dallara, Jr., Ph.D., for a consultative evaluation.  Tr. 475-482.  Dr. Dallara diagnosed Reck with major depression; anxiety disorder, NOS; and PTSD.  Tr. 478.  Dr. Dallara provided a functional assessment of Reck's abilities and limitations in various areas.  Tr. 479.  With respect to Reck's abilities and limitations in understanding, remembering and carrying out instructions, Dr. Dallara opined that Reck would be expected to be able to understand and apply instructions in a work setting consistent with average intellectual abilities.  Tr. 479.  With respect to Reck's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace to perform simple tasks and perform multi-step tasks, Dr. Dallara opined that there was no direct evidence during the examination to suggest impairment in Reck's persistence or pace; Reck was able to track the flow of conversation adequately during the examination and did not exhibit easy distractibility.  Tr. 479.  With respect to Reck's abilities and limitations in responding appropriately to supervision and co-workers in a work setting, Dr. Dallara opined that, due to Reck's depression and anxiety, he would have some difficulties relating to others including fellow workers and supervisors.  Tr. 479.  With respect to Reck's abilities and limitations in responding appropriately to work pressures in a work setting, Dr. Dallara opined that, due to Reck's depression and anxiety, Reck would have difficulties withstanding stress and pressure associated with day-to-day work activity.  Tr. 479.

### c. Reviewing physicians/psychologists

*Physical*

On June 6, 2015, state agency reviewing physician Gerald Klyop, M.D., completed a

Physical RFC Assessment. Tr. 67-69. Dr. Klyop opined that Reck could occasionally lift and/or

carry 20 pounds and frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an

8-hour workday; sit about 6 hours in an 8-hour workday; and push and/or pull unlimitedly, other

than as shown for lift and/or carry. Tr. 67-68. Dr. Klyop opined that Reck could frequently

climb ramps/stairs; occasionally climb ladders/ropes/scaffolds; and occasionally stoop. Tr. 68.

Upon reconsideration, on March 17, 2016, state agency reviewing physician Abraham

Mikalov, M.D., completed a Physical RFC Assessment. Tr. 81-83. Dr. Mikalov reached the

same conclusions as Dr. Klyop regarding Reck's RFC. Tr. 67-69, 81-83.

*Psychological*

On May 18, 2015, state agency reviewing psychologist Aracelis Rivera, Psy.D.,

completed a Psychiatric Review Technique ("PRT") (Tr. 65-66) and Mental RFC Assessment

(Tr. 69-70). In the PRT, Dr. Rivera opined that Reck had mild restrictions in activities of daily

living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining

concentration, persistence or pace; and no repeated episodes of decompensation, each of an

extended duration. Tr. 66. In the Mental RFC Assessment, Dr. Rivera found no understanding

and memory limitations. Tr. 69. Dr. Rivera found that, while Reck had some moderate

sustained concentration and persistence limitations, Reck could perform simple, routine tasks in

a work setting without fast-paced demands. Tr. 69. As far as social limitations, Dr. Rivera

found that there was no evidence of limitation in Reck's ability to ask simple questions or

request assistance and he was not significantly limited in other areas of social functioning. Tr. 70. With respect to adaptation limitations, Dr. Rivera found that Reck was moderately limited in his ability to respond appropriately to changes in the work setting and explained that changes in routine should be easily explained. Tr. 70.

Upon reconsideration, on May 5, 2016, state agency reviewing psychologist Leslie Rudy, Ph.D., completed a PRT (Tr. 79-80) and Mental RFC Assessment (Tr. 83-85). In the PRT, Dr. Rudy opined that Reck had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation, each of an extended duration. Tr. 80. In the Mental RFC Assessment, Dr. Rudy found that Reck was moderately limited in his ability to understand and remember detailed instructions but opined that Reck was capable of understanding and remembering 1-2 step directions. Tr. 83. Dr. Rudy found that Reck had some moderate sustained concentration and persistence limitations but opined that Reck could perform 1-2 step tasks in a work setting without fast-paced demands. Tr. 83-84. With respect to social limitations, Dr. Rudy found that Reck was markedly limited in his ability to interact with the public, moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors, and moderately limited in his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. Tr. 84. She explained further that Reck could interact occasionally and superficially and receive instructions and ask questions appropriately in a work setting but he would not be able to work with the public on a continued and sustained basis. Tr. 84. With respect to adaptation limitations, Dr. Rudy found that Reck was moderately limited in his ability to respond appropriately to changes in the work setting and opined that Reck could adapt to occasional changes in a relatively static setting. Tr. 84-85.

**C.   Testimonial evidence**

**1.   Plaintiff's testimony**

Reck was represented and testified at the hearing.  Tr.  33-52, 54-55.

In response to questions from the ALJ and his attorney regarding his ability to work (Tr. 40-41, 50), Reck indicated he was unable to work because he cannot sit for periods of time without having pain or cramps; he cannot be around a lot of people; and he cannot lift very much without causing strain.  Tr. 41, 50.  Reck indicated that everything started to get bad after June 28, 2011.  Tr. 41.  Reck explained that June 28, 2011, was the second time he had been "blown up."  Tr. 48.  He was standing outside a truck when it was detonated.  Tr. 48.  The first time he had been "blown up" was on June 23.  Tr. 48.  He lost consciousness during the June 28 incident. Tr. 48.  He tried to work a couple of jobs after that and tried to be as normal as possible but it is difficult for him to be around people because of "[n]oises, having people behind [him], hand gestures, their body language."  Tr. 41.  Reck is unable to have his back to doors.[2]  Tr. 41, 49. He cannot go to public places.  Tr. 41.  When he does go to public places, he sweats, shakes and gets paranoid.  Tr. 41.  When he goes to the VA where there are a lot of people, he tries to find a corner and, if there is no corner, he will stand with his back up against the wall.  Tr. 51.  Reck indicated that the largest group of people he can be around is three people.  Tr. 50.  When Reck saw his friend die at work, it was not the first time he had seen someone burn to death and it triggered flashbacks.  Tr. 48-49.

Reck last attended counseling about a year prior to the administrative hearing.  Tr. 41. Reck no longer attends counseling because he believes that all they did was give him a different

---

[2] During the hearing, Reck was not facing the table; he was sitting sideways so his back was not completely to the door.  Tr. 49.

prescription.  Tr. 42.  Reck took Celexa in the past for anxiety and depression but had not taken it for about a year.  Tr. 42.

Reck has headaches that he described as sharp, stabbing pains, lasting no longer than a minute but occurring about six times each day.  Tr. 42.  Reck has been having problems with headaches since June 28, 2011.  Tr. 43.

Reck had physical therapy about a year before the administrative hearing for his back.  Tr. 43.  His back continues to hurt him.  Tr.  43.  Reck's back pain is mainly in his lower back, mid-back and neck.  Tr. 47-48.  His back is always hurting with some days being worse than others.  Tr. 43.  His back problems make it difficult for him to stand for periods of time and make it difficult for him to move from sitting to standing and from lying to standing.  Tr. 43.  Also, Reck's legs are shaky and weak and he has cramping in his legs.  Tr. 48.  Reck is able to lift his son, who weighs 30 pounds, but it hurts.  Tr. 43.

Reck has some problems using his hands – his hands cramp up at least a dozen times each day.  Tr. 43-44.  The cramping occurs in both hands but more with his right hand.  Tr. 44.  He also has problems with his knees.  Tr. 50.  His knees lock up and he has to pop them continuously throughout the day so he is able to bend them when he does walk.  Tr. 50.

Reck had been having some problems with his heart.  Tr. 45.  He had not yet been diagnosed with anything specific but, since June 28, 2011, he had been having very bad dizzy spells and his blood pressure dropped significantly when moving from a sitting to a standing position.  Tr. 45.  Reck has blacked out from his blood pressure dropping.  Tr. 45.  He recalled last blacking out from his blood pressure dropping a week prior to the hearing.  Tr. 45.  Reck had been taking a prescription medication for his blood pressure but had recently stopped taking it because he told his doctors he did not notice any difference with respect to his dizziness.  Tr. 47.

An echocardiogram was scheduled which showed a blockage.  Tr. 47.  However, as of the day before the hearing, the heart specialist was not certain that Reck had a blockage and they were trying to decide the best course of action regarding Reck's heart condition.  Tr. 47.

Reck and his wife do not get along as well as they would like.  Tr. 44.  Per Reck, his wife "considers [him] a light switch[,]"  meaning that,"one minute [he'll] be okay, and the next minute [he'll] be close to going off the wall over something small."  Tr. 44.  Reck gets along okay with his son and loves to do as much with him as he can.  Tr. 44-45.  Reck has fought with others in the past.  Tr. 50.   A few years prior, his wife tried to take him to a country concert and Reck ended up getting in a fight with a guy.  Tr. 50-51.

Reck's wife works from home so she is home during the day.  Tr. 38, 52.  Since Reck and his wife are usually both home, he was unable to recall a time when he watched his son by himself.  Tr. 52.  Reck is able to drive.  Tr. 38.  Reck reported not doing much on a daily basis.  Tr. 38.  He sits around the house; he might help his wife fold laundry or lend her a hand with other chores; he plays with his son or reads to him.  Tr. 38, 39.  Reck explained that he will help his son download games on his tablet and watch him play those games or he will watch his son play with his toys in the basement.  Tr. 49.  Reck watches television and movies but he has a hard time concentrating.  Tr. 51.  He estimated being able to maintain concentration on a task for no longer than 15 or 20 minutes.  Tr. 51-52.  After that length of time, his mind will start to wander and he will forget what he is doing.  Tr. 52.  If he is feeling okay, Reck uses a riding lawn mower to mow their yard.  Tr. 39.  Reck does not have many friends and all of their family live out of town.  Tr. 38.  He might communicate with a friend or family member through phone calls.  Tr. 38.  Reck hunts for water fowl.  Tr. 39.  He had last gone hunting about a week prior to the hearing.  Tr. 49.  He hunts with a few guys that he has met.  Tr. 49-50.  Up until about six

months prior to the administrative hearing when his back starting getting bad, he would go to the local gym early in the morning. Tr. 39. Reck went to the gym early in the morning because the least number of people were at the gym at that time. Tr. 49. He would work out on the treadmill but was unable to lift anything heavy. Tr. 39. Reck had last travelled a few months before the administrative hearing in September. Tr. 39-40. His family travelled to Illinois for four or five days for a funeral. Tr. 40. Reck did some driving but his wife drove most of the way. Tr. 40.

### 2. Vocational Expert

Vocational Expert ("VE") Gene Burkhammer testified at the hearing. Tr. 52-59 The VE described Reck's past work history as including work as an (1) oil well services supervisor, a light, SVP 8 job; (2) utility lineman, a heavy, SVP 7 job; and (3) heavy truck driver, a medium, SVP 4 job.[3] Tr. 53-54.

For his first hypothetical, the ALJ asked the VE to assume an individual of the same age, education and work experience as Reck who would be able to work at the light level; could occasionally climb ladders, ropes or scaffolds; could frequently climb ramps or stairs; could perform simple, routine and repetitive tasks that are free of fast-paced production requirements involving only routine work place changes; could have occasional interaction with the public and with co-workers and contact with others would be superficial, meaning the individual could perform no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others, or being responsible for the safety or welfare of others. Tr. 55. The VE indicated that the described individual would be unable to perform Reck's past work. Tr. 55-56.

---

[3] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000). "Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." *Id.*

However, there were unskilled, light level, SVP 2 jobs in the national economy that the described individual could perform, including (1) housekeeping cleaner; (2) mail clerk; and (3) clerical assistant.  Tr. 56.  The VE provided national job incidence numbers for each of the identified jobs.  Tr. 56.

For his second hypothetical, the ALJ modified the first hypothetical by adding the following limitations: the individual could never climb ladders, ropes or scaffolds; could occasionally climb ramps or stairs; could frequently handle and finger objects bilaterally; and could never use moving machinery, be exposed to unprotected heights, or do any commercial driving.  Tr. 56.  The VE indicated that the individual described in the second hypothetical would be able to perform the three jobs identified in response to the first hypothetical.  Tr. 56.

The ALJ then asked the VE to consider a third hypothetical which was the same as the second hypothetical except that the individual could have no interaction with the public.  Tr. 56.  The VE indicated that the individual described in the third hypothetical would be able to perform the three jobs identified in response to the first hypothetical but the VE would reduce the number of housekeeping jobs from 500,000 to 250,000.  Tr. 56-57.

The ALJ asked the VE a fourth hypothetical – if an individual could occasionally be exposed to irritants, such as fumes, odors, dust, and gases, and poorly ventilated areas, would he be able to perform the three identified jobs.  Tr. 57.  The VE indicated that the described individual would be able to perform the three identified jobs.  Tr. 57.

The ALJ asked the VE a fifth hypothetical – if an individual could occasionally stoop, kneel, crouch, and crawl and frequently balance, would he be able to perform the three identified jobs.  Tr. 57.  The VE indicated that the described individual would be able to perform the three identified jobs.  Tr. 57.

For his sixth hypothetical, the ALJ asked to what extent could an individual be off task and be able to perform any of the three identified jobs. Tr. 57. The VE indicated that the individual could be off task up to 15% of the time. Tr. 57-58.

Reck's counsel asked the VE whether an individual as described in the ALJ's third hypothetical which included a limitation of no interaction with the public would be able to perform jobs if the individual was limited to no interaction with the public and co-workers. Tr. 58. The VE indicated that the additional limitation of no interaction with co-workers would be work preclusive. Tr. 58.

Reck's counsel then asked the VE to consider the ALJ's first hypothetical with additional limitations of needing to work in an area where the individual would never have his back to the door, there would be no people behind the individual, there would be no interaction with the public, and no loud noises. Tr. 59. The VE indicated that there might be some jobs available for an individual with those limitations but, in most cases, it would be an accommodation. Tr. 59.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[4] . . . .

---

[4] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[5] claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

---

[5] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

# IV. The ALJ's Decision

In his January 9, 2017, decision, the ALJ made the following findings:[6]

1.  Reck meets the insured status requirements of the Social Security Act through December 31, 2020. Tr. 15.

2.  Reck has not engaged in substantial gainful activity since November 11, 2014, the alleged onset date. Tr. 15.

3.  Reck has the following severe impairments: lumbar strain with degenerative disc disease, lumbar radiculopathy of the lower extremities, intracranial injury, anxiety disorder, affective disorder, and posttraumatic stress disorder with major depression and residuals of a traumatic brain injury. Tr. 15. Reck has the following non-severe impairments: bilateral knee arthralgia and cervical disc disease with radiculopathy. Tr. 15-16.

4.  Reck does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 16-17.

5.  Reck has the RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b) except he can frequently climb ramps or stairs but occasionally climb ladders, ropes or scaffolds; he must avoid the use of moving machinery, commercial driving, and unprotected heights; he can perform simple, routine, and repetitive tasks; work environment must be free of fast-paced production requirements and involve only routine workplace changes; he can have occasional public contact; he can do tasks with occasional interaction with co-workers; he is limited to superficial contact with others in that he can do no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others, or being responsible for the safety or welfare of others. Tr. 18-21.

6.  Reck is unable to perform any past relevant work. Tr. 21.

7.  Reck was born in 1990 and was 24 years old, defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 22.

8.  Reck has at least a high school education and is able to communicate in English. Tr. 22.

9.  Transferability of job skills is not material to the determination of disability. Tr. 22.

---

[6] The ALJ's findings are summarized.

10. Considering Reck's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Reck can perform, including housekeeping cleaner, mail clerk, and clerical assistant. Tr. 22-23.

Based on the foregoing, the ALJ determined Reck had not been under a disability, as defined in the Social Security Act, from November 11, 2014, through the date of the decision. Tr. 23.

## V. Plaintiff's Arguments

First, Reck argues that the ALJ erred by not assigning great weight to a Veterans Administration's disability determination that Reck was one-hundred percent disabled as a result of his PTSD. Doc. 14, pp. 13-16, Doc. 16, pp. 3-4. Next, Reck argues that the ALJ did not properly evaluate his credibility. Doc. 14, pp. 16-18, Doc. 16, pp. 1-3. Last, Reck argues that the ALJ did not meet his burden at Step Five because the ALJ discounted restrictions proffered by the Veterans Administration and in Reck's testimony, e.g., need to have his back to the door, no public setting, no loud noises, and no interaction with the public. Doc. 14, pp. 18-21, Doc. 16, p. 5.

## VI. Law & Analysis

### A.    Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.      The ALJ did not err in his consideration and weighing of the VA disability determination**

Reck challenges the ALJ's consideration and weighing of the VA's disability determination. The VA concluded that Reck had a combined rating of 100% as of October 27, 2012, for PTSD with major depressive disorder and residuals of traumatic brain injury. Tr. 202. The VA also concluded that Reck had a combined 30% rating for back-related impairments. Tr. 202. Reck argues that the ALJ should have assigned great weight to the VA's disability determination and, had the VA determination regarding PTSD been adopted, Reck should have been found to have marked difficulties in activities of daily living, social functioning, and concentration, persistence or pace. In making this argument, Reck contends that the ALJ did not properly evaluate the VA disability determination as required by SSR 06-03p – *Considering Opinion and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in*

*Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencie*s, 2006 WL 2329939 (Aug. 9, 2006).[7]

SSR 06-03p states that decisions by governmental agencies, e.g., Department of Veterans Affairs, about whether an individual is disabled is based on its rules and is not a decision that is binding on the Social Security Administration. *Id.*, 2006 WL 2329939, * 6. Nevertheless, because adjudicators in social security cases are required to evaluate all evidence in the record that may pertain to a determination or decision of disability, including a decision by another governmental agencies, "evidence of a disability decision by another governmental . . . agency cannot be ignored and must be considered." *Id.* Yet, SSR 06-03p also indicates that, "because other agencies may apply different rules and standards than [social security] do[es] for determining whether an individual is disabled, this may limit the relevance of a determination of disability made by another agency." *Id.* at * 7. "However, the adjudicator should explain the consideration given to these decisions in the notice of decision for hearing cases and in the case record for initial and reconsideration cases." *Id.*

The Sixth Circuit has confirmed that a VA disability rating is entitled to consideration. *Ritchie v. Comm'r of Soc. Sec.*, 540 Fed. Appx. 508, * 510 (6th Cir. Oct. 4, 2013) (unpublished); *LaRiccia v. Comm'r of Soc. Sec.*, 549 Fed. Appx. 377, * 388 (6th Cir. Dec. 13, 2013) (unpublished). And, as required by SSR 06-03p, "[r]egardless of the weight afforded, an ALJ 'should explain the consideration given to these decisions in the notice of decision.'" *LaRiccia*, 549 Fed. Appx. at 388. Nonetheless, a VA disability determination "is only one factor to be

---

[7] SSR 06-03p was rescinded for claims filed on or after March 27, 2017. 82 FR 15263-01, 2017 WL 1105348 (Mar. 27, 2017). SSR 06-03p was rescinded in part because social security rules were revised and revisions therein provided that "adjudicators will not provide any articulation about their consideration of decisions from other governmental agencies and nongovernmental entities because this evidence is inherently neither valuable nor persuasive to us." *Id.*; *see also* 20 C.F.R. § 404.1504 (eff. Mar. 27, 2017). Notwithstanding these rule revisions, Reck's claim was filed prior to March 27, 2017, and therefore, SSR 06-03p is applicable to his claim.

considered in making a social security disability finding." *Ritchie*, 540 Fed. Appx. at 511.

Additionally, an "administrative law judge [is] not bound to accept [a] disability rating made by

the Veterans Administration." *Ritchie,* 540 Fed. Appx. at 510; *LaRiccia*, 549 Fed. Appx. at 387-

388. And, the court "has not set forth a specific standard regarding the weight the Commissioner

should afford a 100% disability determination by the VA." *LaRiccia*, 549 Fed. Appx. at 387; *see

also Ritchie*, 540 Fed. Appx. at 510 ("[W]e have not specified the weight . . . a [VA disability]

determination should carry when determining social security disability eligibility.").

In *Ritchie*, an unpublished Sixth Circuit case, decided in October 2013, the court affirmed

the Commissioner's decision, finding that the ALJ adequately explained her reasons for not

accepting the VA's disability determination. *Ritchie*, 540 Fed. Appx. at 510-511. A few months

after *Ritchie*, the Sixth Circuit, in *LaRiccia* issued another unpublished decision. *LaRiccia*, 549

Fed. Appx. at 387-388. In *LaRiccia*, the court reversed the Commissioner's decision because the

court concluded that the ALJ's reasons for the weight provided a VA disability determination

could not be credited because they did not accurately reflect the approaches taken by the VA and

Social Security Administration. *Id.* at 388.

In Reck's case, the ALJ discussed and weighed the VA's disability ratings, stating:

As for the opinion evidence, the record contains several documents indicating that
the claimant had various levels of disability ratings by the Department of Veterans
Affairs (VA), including ten percent for his physical conditions and one hundred
percent for his mental impairments (10D/2). The VA indicated that the claimant
complained of mild memory loss, he had total occupational and social impairment,
he had difficulty adapting to work and stress, he had difficulty establishing social
relationships, and his depression affected his ability to function independently.

I give little weight to the findings of the VA. The VA standards for disability differ
from those of the Social Security Administration. Moreover, the record fails to
document the significant degree of limitations that the VA report described. While
the claimant had ongoing mental symptoms, he retained largely appropriate
behavior at exams and normal thoughts. Additionally, the evidence does not show

such significant problems functioning independently. Finally, the determination of disability is reserved to the Commissioner.

Tr. 20.

Reck has failed to show that the ALJ's consideration of the VA disability determination was contrary to SSR 06-03p. The ALJ did not ignore the VA determination. The ALJ correctly noted that VA standards for disability are different than Social Security Administration standards for evaluating disability. *See e.g., Deloge v. Comm'r of Soc. Sec. Adm.*, 540 Fed. Appx. 517, 519 (6th Cir. Oct. 15, 2013)(unpublished) ("The VA relies on independent and distinct criteria to assess disability[.]"). The ALJ was also correct in concluding that the determination of disability is reserved to the Commissioner. SSR 06-03p, 2006 WL 2329939, * 6 ("[R]egulations . . . make clear that the final responsibility for deciding certain issues, such as whether you are disabled, is reserved to the Commissioner[.]"). The ALJ did not stop there with his reasons for discounting the VA disability determination. After discussing in detail Reck's medical records and other evidence of record, the ALJ explained that the record did not demonstrate the significant degree of limitations as contained in the VA report. Tr. 20. For example, the VA's report indicated that Reck had total occupational and social impairment. Tr. 20, 315. However, the ALJ found that, notwithstanding alleged problems getting along with his wife, he had lived with his wife throughout the relevant period with little indication of major issues in their relationship. Tr. 17. Also, while Reck reported an altercation with another individual, he did not show signs of ongoing substantial behavior problems. Tr. 17. Reck behaved properly during examinations and was able to go shopping and hunting. Tr. 17. The ALJ also explained that, while Reck had ongoing mental symptoms, his behavior at examinations was "largely appropriate" and he did not exhibit significant problems functioning independently. Tr. 20. Reck has not demonstrated that the ALJ's analysis was improper or that it is unsupported by substantial evidence.

Reck takes issue with the Commissioner's contention that the ALJ's findings are supported by the opinions of state agency reviewing psychologists who concluded that Reck had no more than moderate limitations in activities of daily living, social functioning, or maintaining concentration, persistence or pace, arguing that the reviewing psychologists' evaluations were completed without the complete VA Rating Decision which was submitted on December 15, 2016. Doc. 16, p. 4. Reck's counsel submitted the VA Rating Decision to the ALJ on December 15, 2016. Tr. 310. However, the Rating Decision is dated April 7, 2015 (Tr. 310, 311), which is prior to the May 2015 and May 2016 state agency reviewing psychologists' evaluations (Tr. 70, 85). Furthermore, when Dr. Rudy conducted the evaluation at the reconsideration stage, the VA 100% disability determination was part of the "findings of fact and analysis of evidence" section of the disability determination explanation. Tr. 78. Thus, it cannot be said that the ALJ erred in relying on the state agency reviewing psychologists' opinions to support his findings.

Reck also argues that the Sixth Circuit's unpublished decision in *LaRiccia* obligated the ALJ to discuss the approaches used by both agencies to evaluate disability. Doc. 16, p. 4. The Court finds this argument unavailing. *LaRiccia* is an unpublished decision. Furthermore, the court in *LaRiccia* did not hold that an ALJ must describe in detail the approaches used by both agencies. Rather, it evaluated the ALJ's reasons for not crediting the VA's disability determination and concluded that the ALJ's reasons in that case were not accurate. Here, while Reck disagrees with the ALJ's evaluation of the evidence, Reck has not argued or demonstrated that there are inaccuracies with the ALJ's reasons for providing little weight to the findings of the VA. Nor has he shown that the ALJ's reasons are unsupported by substantial evidence. The ALJ acknowledged that Reck had limitations in various functional areas. However, he did not find Reck's limitations as disabling as the VA found them to be under its system for evaluating

disability. As discussed above, the ALJ provided specifics as to why he did not find Reck's impairments as limiting as the VA had found them to be. Tr. 20. Under 06-03p, the ALJ was not bound by the VA's disability determination and Reck has not shown that reversal and remand is warranted for further consideration of the VA disability determination.

## C.      The ALJ properly assessed Reck's credibility

Reck argues that the ALJ erred in assessing his credibility. A claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability. 20 C.F.R. § 404.1529(a); SSR 16-3p, 2017 WL 5180304.[8] When a claimant alleges impairment-related symptoms, a two-step process is used to evaluate those symptoms. 20 C.F.R. § 404.1529(c); 2017 WL 5180304, * 2-8.

First, a determination is made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms, *e.g*., pain. SSR 16-3p, 2017 WL 5180304, * 3-4. Second, once the foregoing is demonstrated, an evaluation of the intensity and persistence of the claimant's symptoms is necessary to determine the extent to which the symptoms limit the claimant's ability to perform work-related activities. *Id.* at * 3, 5-8. To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence. SSR 16-3p, 2017 WL 5180304, * 5-8. In addition to this evidence, the factors set forth in 20 C.F.R. 404.1529(c)(3) are considered. *Id.* at *7-8. Those factors include daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any

_____

[8] SSR 16-3p replaces SSR 96-7p and applies to rulings on or after March 28, 2016. *See* 2017 WL 5180304, at *1, 13.

medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, *e.g.*, lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms. *Id.* The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at * 10.

"An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

Following a detailed discussion of the evidence (Tr. 18-21), the ALJ explained his reasons for finding Reck's statements regarding the limiting effects of his symptoms only partially consistent with the record. Tr. 21. The ALJ stated:

> [T]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

Tr. 18-19.

> With respect to the claimant's alleged symptoms and limitations, I find such assertions only partially consistent with the evidence. The claimant reported headaches throughout the relevant period, but his complaints decreased in frequency, indicating diminishing headaches. Moreover, he had only sporadic complaints of back pain, with conservative treatment. Indeed, he took medication and he had only a brief course of physical therapy, which he voluntarily ended because he did not believe he required further therapy. Furthermore, the claimant

had largely only minor strength deficits with normal ambulatory ability. Such facts are incongruent with the significant degree of physical symptoms that he described.

In terms of the claimant's mental symptoms, he was depressed and anxious, with PTSD symptoms. He had some problems getting along with others and he displayed some trouble concentrating. However, he exhibited largely normal behavior at exams and he did not have severe cognitive limitations. Additionally, he hunted with others, he lived with his family, and he traveled at times. Further, the claimant took medication without seeking any ongoing mental health therapy but he remained functional. Accordingly, the record supports a finding that he remained capable of performing unskilled tasks with limited interaction with others in a relatively static environment.

Tr. 21.

In a conclusory fashion, Reck argues that the foregoing analysis was prejudicial and that the ALJ played doctor by making suppositions about Reck's treatment at the VA and then erroneously basing his credibility assessment on those alleged false suppositions. Doc. 14, pp. 17-18. Reck fails to demonstrate that the ALJ ignored or misconstrued the evidence. He argues that his own testimony at the hearing, which included testimony that he cannot be around others, cannot have his back to doors, would have difficulty in public places, and sits or stands in the corner while at the VA for medical appointments, shows that the ALJ's assessment of his credibility is flawed. Doc. 16, p. 2. However, those statements are the subjective statements that the ALJ considered and found only partially consistent with the evidence. As is clear from the ALJ's decision, consistent with the regulations, the ALJ considered Reck's subjective statements regarding his symptoms. The ALJ considered the objective evidence. He also considered factors set forth in 20 C.F.R. 404.1529(c)(3). For example, he considered the duration, frequency, and intensity of pain or other symptoms (Reck's complaints of headaches decreased in frequency); treatment, other than medication (brief physical therapy which Reck felt he no longer needed and no ongoing mental health therapy); and daily activities (hunting and traveling with family at times). Tr. 21.

32

In sum, Reck disagrees with the ALJ's credibility determination. However, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner,* 745 F.2d at 387. And, the ALJ's decision makes clear that the ALJ fully considered the record and assessed the credibility of Reck's subjective statements and did not limit his credibility assessment to one piece of evidence. Having reviewed the ALJ's decision, and considering that an ALJ's credibility assessment is to be accorded great weight and deference, the undersigned finds that the ALJ's credibility analysis regarding the severity of Reck's mental and physical impairments is supported by substantial evidence. Accordingly, even if other evidence were shown to support Reck's position, reversal and remand is not be warranted. *Jones*, 336 F.3d at 477 (Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ.").

**D.      The ALJ did not err at Step Five**

For his final argument, Reck repackages his prior arguments into a Step Five argument. He argues that the ALJ did not meet his burden at Step Five because he discounted any restrictions proffered by the VA or by him, including restrictions of not having one's back towards the door; no public setting; no loud noises; and no interaction with the public. Doc. 14, p. 20. He contends that, with those restrictions, based on the VE testimony, there would be no work available without accommodations. Doc. 14, p. 20.

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments.

Hypothetical questions, however, need only incorporate those limitations which the ALJ has accepted as credible." *Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) and *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).  As discussed above, the ALJ did not err in his consideration or weighing of the VA disability determination and he did not err in assessing Reck's subjective statements.  Thus, it was not error for the ALJ not to include in the RFC or corresponding VE hypothetical the restrictions cited by Reck.  Since the VE hypothetical upon which the ALJ relied incorporated those limitations that the ALJ accepted as credible, the VE's testimony serves as substantial evidence in support of the ALJ's Step Five finding. Accordingly, reversal and remand is not warranted.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.


Dated: May 1, 2018

_____
Kathleen B. Burke
United States Magistrate Judge